UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

REBECCA FINLEY,
Plaintiffs,

                            Case No. 2:07-cv-236
v.                                      HON. R. ALLAN EDGAR

MANOR CARE OF KINGSFORD,
MI, L.L.C.
Defendants.

---

Plaintiff is requesting oral argument, pursuant to Local Rule 7.2(d) of the Western District of Michigan.

Plaintiff's counsel spoke with Defendant's counsel on August 26, 2008, to ascertain whether they would be opposing this motion, in compliance with Local Rule 7.1(d) of the Western District of Michigan. Defendant's counsel indicated they would oppose this motion.

---

**PLAINTIFF'S BRIEF IN SUPPORT OF HER MOTION FOR SUMMARY DISPOSITION AND REQUEST FOR ORAL ARGUMENT**

**NOW COMES** Plaintiff, Rebecca Finley, by and through her attorneys, Mouw & Celello, P.C., and hereby states in support of her motion for summary disposition the following:

**BACKGROUND FACTS**

Rebecca Finley was employed by the Defendant, Manor Care of Kingsford, MI, L.L.C. in February 2007, as a certified nurse's aide, when her son, Antonio, became ill and was admitted to the Dickinson County Memorial Hospital. Rebecca had worked at the Manor Care facility in Kingsford since April, 2004, and had been a very well liked, and greatly accomplished worker. She had been often complimented on her exceptional work ethic. (Exhibit A). Antonio was born on November 13, 1999.

In 2006, Rebecca was pregnant with what would have been her second child, but

unfortunately in the summer of that year, she suffered a spontaneous abortion and the child was lost.  She had a surgery thereafter to correct some related problems, but the doctors advised her that it would be risky for her to attempt to have another child.  Sometime in August, 2006, however, Rebecca again became pregnant, and in light of her doctor's warnings of risks, took her health very seriously.  Manor Care accommodated her needs by following the doctor's recommendation that Rebecca only work two days consecutively at a stretch.  (Exhibit B, pg. 87; Exhibit C).  In spite of her caution, several health issues led Rebecca to miss time from work, for which she used sick or vacation time that she had available.  (Exhibit D, 9(a); Exhibit E).  Rebecca's pregnancy was progressing fine, when in February 2007, her ex-husband, Lee Crandall, called her and informed her that her son was not looking too good and that he had swollen glands and a fever.  Understandably concerned, Rebecca took charge of her son, and contacted a good friend and pediatrician, Dr. Darling, who visited the child and was concerned about the state of his health.  Antonio was brought to the hospital where he received IV therapy on Friday, February 9, at around 11 a.m., after he was admitted to the hospital.  He stayed there for several hours undergoing several tests to attempt to find out what was wrong with him.  After the physician's felt they had the situation under control, they sent him home with Rebecca.

The next day, Rebecca brought Antonio to see Dr. Darling at her clinic.  Dr. Darling noted that Antonio was much improved on this visit.  The next day, Antonio took a turn for the worse.  Dr. Darling notes that she saw him during a home visit, and was concerned about signs of decreased responsiveness, tachycardia, fever, and diminished capillary refill.  (Exhibit K.)  Because Antonio has a history of complex febrile seizures and because glucose had been found in his urine on February 9, 2008, Dr. Darling decided that the best course was to admit him to try

and find out what was going on. (Exhibits K and L.) So on Sunday, February 11, 2008, at around 8:07 p.m., Antonio was admitted to the hospital, to stay for an indeterminate period. (See Exhibit F).

All the while during this confused period of worry and strain, Rebecca had been trying to keep work informed of the situation. Though she understandably has mixed up dates and times, her schedule with Manor Care clearly shows that she was not working on Friday, but was scheduled to work Saturday. (Exhibit G). Rebecca called in before this Saturday shift to let them know that her son was in the hospital, and therefore she would be unable to make it for this shift. (Exhibit H). After Antonio was admitted for the second time on Sunday, Rebecca was unsure how long her son would need to be in the hospital. (Exhibit B, pg. 94). So that she could be with him and take care of him, she went to work on Monday, February 12, 2008, to discuss the situation and give them a note from the hospital confirming that her son was ill and had been admitted. Rebecca asked to see the Human Resources Director, Tanya Hiltonen. When Rebecca was informed that Ms. Hiltonen was on vacation, she was directed to speak with Robin Matchett, the Director of Nursing. (Exhibit B, pp., 33-35, 71).

Rebecca handed the note from the hospital to Ms. Matchett, and told her that she wanted to take "family leave." (Exhibit B, pg. 71). Rebecca told her that her son was in the hospital and that she didn't know how long he would be there. (Exhibit B, pp. 92-94). Ms. Matchett then reached into a drawer at the nurse's station and pulled out a form that she signed and dated. Ms. Matchett pointed Rebecca's attention towards a provision on the form and she was asked to sign it. The form basically asked Rebecca to agree to not take any more time off of work in the next 30 days, lest her employment be terminated. (Exhibit B, pp. 72, 95). Rebecca was well along in

a risky pregnancy and her son was in the hospital. She had vacation and sick time available to her. (Exhibit D, 9(a)). Rebecca could not say that she would not miss any more time, as she did not know what the future held. Having suddenly been presented with the need to care for her seriously ill child, she was now presented with an ultimatum: either sign the document and not be able to take care of her child or be fired. Shocked, bemused, and incredulous, Rebecca told Ms. Matchett that she could not sign such a document. At that time, Ms. Matchett asked Rebecca if she was refusing to work. Rebecca denied that she was refusing to work, but insisted that she did need time off to care for her ailing son. (Exhibit B, pg. 72). This apparently was unsatisfactory for Ms. Matchett, who then reached over to the assignment sheet, which showed the scheduling, and began crossing off Rebecca's name. (Exhibit B, pg. 72). Rebecca was not granted the leave she requested, and her name was crossed off of the schedule, and so she thought, as anyone reasonably would in her situation, that she was fired. (Exhibit B, pg. 99).

**ANALYSIS**

The Family and Medical Leave Act of 1993 ("the Act") understands the tricky situation that a working mother can be placed in when one of her children becomes seriously ill. To alleviate iniquities in the workplace and obviate the need to make the kind of fait accompli that Rebecca made, the Act was passed "to entitle employees to take reasonable leave . . . for the care of a child . . . who has a serious health condition." 29 U.S.C. § 2601(b)(2). The drafters of this legislation pointed out that "it is important for the development of children and the family unit that . . . mothers be able to participate in . . . the care of family members who have serious health conditions." 29 U.S.C. § 2601(a)(2). The drafters then expressed their concern about "the lack of employment policies to accommodate working parents" and how this "can force individuals to

4

choose between job security and parenting," just like Rebecca Finley. 29 U.S.C. § 2601(a)(3).

The Act states that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period" so that they may " . . . care for . . . a son . . . of the employee, if such . . . son . . . has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). Of course, this provision begs several questions. What is an "eligible employee"? Can the person be employed by anybody? What is a "serious health condition"? Each will be answered in turn.

**A.** **Is the Plaintiff an "eligible employee" within the meaning of the Act?**

The Act defines an "eligible employee" as an employee who has been employed for at least twelve months and for at least 1,250 hours of service during the previous 12-month period, by the employer with respect to whom leave is requested. Also, the employer must employ at least 50 employees at the employee's worksite. 29 U.S.C. § 2611(2). Plaintiff was hired by the Defendant on April 27, 2004. (Exhibit D, 3). The Defendant's Kingsford facility employed 128 employees. (Exhibit D, 2). In the 12-month period preceding her termination, the Plaintiff worked 2,125 hours for the Defendant. (Exhibit D, 7). Therefore, the Plaintiff was an "eligible employee" as defined by the Act.

**B.** **Is the Defendant an "employer" within the meaning of the Act?**

The Act also defines an "employer" as "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." 29 U.S.C. § 2611(4)(A)(i). As already stated, the Defendant employed 128 people at its facility, and actively offers and gives FMLA leave. (Exhibit D, 2; Exhibit I; Exhibit J). The Defendant is an employer, as defined by the Act.

5

## C. Did the Plaintiff's son have a "serious health condition" within the meaning of the Act?

A "serious health condition" is an illness, injury, impairment, or physical or mental condition that involves "inpatient care in a hospital" or "continuing treatment by a health care provider." 29 U.S.C. § 2611(11)(A) & (B). Antonio became ill sometime around February 9, 2008. He intermittently ran a fever, had tachycardia, was vomiting, and glucose had been found in his urine. Glucose in the urine may be a sign of kidney malfunction, about which special concern would be noted, as kidney failure runs in Rebecca's family. (Exhibit B, pg. 65). Additionally, Antonio had a history of seizures associated with fever, so this was also a serious concern. (Exhibit K). Antonio was admitted to the hospital on February 9, 2008. (Exhibit L). He was visited by Dr. Darling to check on his condition on February 10, 2008. (Exhibit K). He was again admitted to the hospital on February 11, 2008. (Exhibit F). He was discharged late on February 12, 2008. (Exhibit M). During the week after he was discharged he had to visit Dr. Darling three times, to check up on his condition and run further tests. (Exhibit B, pg. 66). Antonio's illness required "inpatient care in a hospital" and "continuing treatment by a health care provider", and therefore constituted a "serious health condition" as defined by the Act.

## D. What conduct is prohibited by the Act?

This case arises not solely because Rebecca was entitled to Family Medical Leave under the Act, but rather because that right was interfered with by the Defendant and also because Rebecca was discriminated against and discharged from her employment for opposing that interference. The Defendant is specifically prohibited from doing this by the Act, which states:

> (a) Interference with rights
>     (1) Exercise of rights – It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to

> exercise, any right provided under this subchapter.
> (2) Discrimination – It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a)(1) & (2).

The Sixth Circuit Court of Appeals "recognizes two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir., 2004).

### 1. Can the Plaintiff establish a "discrimination" claim under the Act?

"There are three methods by which an FMLA plaintiff may establish a prima facie case of FMLA discrimination: by direct evidence of discriminatory intent; by circumstantial evidence of discriminatory intent through the use of the paradigm postulated in *McDonnell Douglas*; or by establishing a pattern of discrimination through the use of statistical evidence." *Summerville v. Esco Co. Ltd. Partnership*, 52 F. Supp.2d 804, 809 (W.D. Mich., 1999).

#### a. Is there direct evidence of discrimination?

In the case presently before this court, there is direct evidence of discriminatory intent. The McDonnell Douglas burden-shifting framework that applies to circumstantial evidence cases is not necessary in direct evidence cases. *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 879 (6th Cir.1991). "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to

7

draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003). Also, "an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir.2002).

In the case of *Joostberns v. United Parcel Services, Inc.*, 166 Fed. Appx. 783, 791-792, 2006 WL 41189, 7 (6th Cir., 2006), attached as Exhibit N, the plaintiff's supervisor, Dan Langdon allegedly made comments that "Plaintiff was taking too much time off work and that absences would result in negative consequences." *Ibid.*, at 791. The court analyzed these statements and found that they were not direct evidence of discrimination because the plaintiff's supervisor did not directly say that the negative consequences included termination. The court found that "the factfinder would have to infer that the negative consequences Langdon was referring to included termination. The necessity of this inference renders the statements indirect proof." *Ibid.*, at 792. The court also found that Langdon's involvement in the decision to terminate the plaintiff was too indirect for it to reach a conclusion that the plaintiff was terminated for taking FMLA leave. *Ibid.*

The facts in *Joostberns* enlighten the analysis of our case, which differs precisely on the points which that court found lacking in that plaintiff's "direct evidence". Robin Matchett was the Director of Nursing at the Defendant's facility on February 12, 2007. The Plaintiff visited the facility to provide documentation of her son's illness in conjunction with her request for

8

"family leave." Upon entering the facility, the Plaintiff requested to speak to Tanya Hiltonen, the human resources director, about family leave. The Plaintiff was following the advice of the Manor Care handbook, which advises one to "contact your human resources designee for detailed information on FMLA leave." (Exhibit I). She was informed by Ms. Matchett that Ms. Hiltonen was on vacation, but was asked if there was something she (Ms. Matchett) could do to help her. The Plaintiff told Ms. Matchett that Antonio was in the hospital and it was unclear how long he would have to remain there. Ms. Matchett reviewed the nurse's note that the Plaintiff handed to her, which explained that Antonio was in the hospital. The Plaintiff told Ms. Matchett that she would need family leave because of this situation. (Exhibit B, pg. 85).

Ms. Matchett then withdrew a document from a nearby drawer, and told the Plaintiff to read and sign it. Instead of being the forms necessary to take FMLA leave, the document produced by Ms. Matchett said that if the Plaintiff were to call in at any time during the next 30 days she would be terminated. (Exhibit B, pp. 34, 71, 94). Rebecca refused to sign the document because she needed family leave and would obviously have to take time off. Upon Rebecca's refusal, Ms. Matchett said, "Well, I guess you're choosing not to work," and proceeded to cross Rebecca's name off of the assignment sheet. (Exhibit B, pg. 34). It was clear to Rebecca that she had been fired. (Exhibit B, pg. 99). No inference is needed to show that Rebecca was discriminated against for attempting to take FMLA leave. Directly after requesting leave and providing documentation of her son's hospitalization, she was told to sign a document that stated she would not take any more time off in the next 30 days or she would be fired. Obviously, this would include taking FMLA leave. Unlike *Joostberns*, it was directly stated on the document that if Rebecca took time off she would be fired. Finally, as Director of Nursing,

9

Ms. Matchett had authority to fire the Plaintiff and was the person directly responsible for her discharge. That authority was clearly ratified by the Defendant since she was never again contacted by the Defendant about her job. This is direct evidence of discrimination, and no genuine issue regarding a material fact exists, and summary disposition should be granted on this issue.

### b. Is there indirect evidence of discrimination?

To establish a "discrimination" claim under the FMLA by indirect evidence, a plaintiff must show that: "(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." *Killian v. Yorozu Automotive Tennessee, Inc.*, 454 F.3d 549, 556 (6th Cir., 2006). See also *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 450-451 (6th Cir., 2005).

#### (1). Was the Plaintiff engaged in an activity protected by the Act?

"The right to actually take twelve weeks of leave pursuant to the FMLA includes the right to declare an intention to take such leave in the future." *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 314 (6th Cir., 2001). The Plaintiff was requesting leave under the Act when she was discriminated against, therefore, this prong of the analysis is met.

#### (2). Did the Defendant know the Plaintiff was exercising her rights under the Act?

Situations like that encountered by the Plaintiff, where the need for leave comes suddenly and is unforeseeable, are governed by 29 C.F.R. § 825.303(a), which states that:

> "an employee should give notice to the employer of the need for

> FMLA leave as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible. In the case of a medical emergency requiring leave because of an employee's own serious health condition or to care for a family member with a serious health condition, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved."

The employee "need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed." 29 C.F.R. § 825.303(b). However, the employee must provide "the employer enough information for the employer to reasonably conclude that an event [such as one described in 29 U.S.C. § 2612(a)(1)(C)] has occurred." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999). "[W]hat is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case." *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 724 (6th Cir. 2003) (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995)).

The Plaintiff's son was admitted to the hospital twice over the weekend. The first time, he stayed only a short time, did not stay overnight, was given treatment, and sent home, where he seemed to improve. Thus what might have seemed like a situation where FMLA leave was necessary was tempered. However, on Sunday, he became much worse and had to be readmitted, this time overnight, and it was at this time that Rebecca realized she needed to take some time from work, because the doctors were unsure what was wrong with Antonio and no one knew how long he would have to stay. (Exhibit B, pg. 68). Rebecca told Ms. Matchett that her son was in the hospital and that she did not know how long he would be there. Rebecca told Ms. Matchett that she wanted "family leave". Rebecca also provided a note from a nurse at the

11

hospital explaining the situation. (Exhibit B, pp. 68, 92-94). Given this information, it is impossible not to conclude that Rebecca's son had a serious health condition, and thus that an FMLA situation existed.

There is also an affirmative duty on the part of the employer to inquire further if it thinks that the information provided regarding the reason for the leave is inadequate. "[I]f the employer feels it does not have sufficient information to determine whether the employee's reasons for requesting leave are encompassed by the FMLA, 'the employer should inquire further of the employee . . . to ascertain whether the paid leave is potentially FMLA-qualifying." 29 C.F.R. § 825.208(a). *Plant v. Morton Intern., Inc.*, 212 F.3d 929, 935 (6th Cir., 2000). The Defendant knew that Rebecca was requesting FMLA leave and denied it. If they somehow were unconvinced that she was requesting FMLA leave or that she had a qualifying reason, it was their responsibility to request further documentation. In the past, the Defendant had given Rebecca FMLA leave and accepted a note from her doctor as documentation. (Exhibit B, pp. 24-25; Exhibit J). Thus, the Defendant's own actions have led her to believe that such documentation would be sufficient.

### (3). Did the Defendant take an adverse employment action against the Plaintiff after learning of her request for leave?

As already discussed in section D.1.a. of this brief, the Plaintiff was discharged from her employment after requesting "family leave". If the court should find that the Plaintiff was not directly discharged by the Defendant, then it should consider whether she was constructively discharged. In *Saroli*, *supra*, the adverse employment action complained of was a constructive discharge. The court in *Saroli* analyzed the case of *Logan v. Denny's, Inc.*, 259 F.3d 558 (6th Cir.2001), for an understanding of what is required to show a constructive discharge. "To

demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit . . . . To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Logan*, at 568-569.

For help in determining whether the first prong of the constructive discharge analysis has been met, the 6th Circuit Court of Appeals has adopted the following factors:

> Whether a reasonable person would have [felt] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a [male] supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or *continued employment on terms less favorable than the employee's former status*.

*Ibid.*, at 569 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000). Emphasis added.). This list of factors is helpful but not exclusive. *Ibid.*, at 570.

Under Michigan law, a similar test has been developed. "[A] constructive discharge occurs only where an employer or its agent's conduct is so severe that a reasonable person in the employee's place would feel compelled to resign." *Jacobson v. Parda Fed. Credit Union*, 457 Mich. 318, 328, 577 N.W.2d 881, 885 (1998). Although the test is an objective one, some Michigan courts have found that "[a]n employer is held to intend the reasonably foreseeable consequences of his conduct." *Jenkins v. Amer. Red Cross*, 141 Mich. App. 785, 796, 369 N.W.2d 223, 229 (1985).

In our case, we must analyze Robin Matchett's conduct, because she is the Defendant's

13

agent. The Plaintiff requested FMLA leave and was immediately asked to sign a document that would remove her ability to take time off of work for the next 30 days, under penalty of termination. Thus, even though she had vacation and sick time available to her, Rebecca would be unable to use it. Furthermore, she would be unable to take FMLA leave, as was her right. Therefore, when Ms. Matchett asked Rebecca to sign the document, she was offering continued employment on terms less favorable than Rebecca's former status. The Defendant contends that Rebecca quit her employment, but with such an unfavorable and unconscionable offer, given that her son was in the hospital with an unknown illness, it is only reasonable that she should have done so. In other words, continued employment became intolerable when it was revealed that for her to remain employed she would have to give up her right to take care of her hospitalized child. Add to this the facts that Ms. Matchett knew that Rebecca had recently lost a child and was well along in a troubled pregnancy. (Exhibit B, pg. 104; Exhibit J). It must have been reasonably foreseeable to Ms. Matchett that her response to Rebecca's request would cause her to quit.

### (4). Was there a causal connection between the protected activity and the adverse employment action?

Within moments of Rebecca's request for FMLA leave, she was asked to sign an agreement not to take any time off for the next 30 days lest she be terminated. When she refused, she was immediately crossed off of the assignment sheet by Ms. Matchett. Her discharge was directly and proximately related to that request. An employer's knowledge that an employee is engaging in a protected activity, followed closely in time by an adverse employment action, can create an inference of causation where the other circumstances of the case support that inference. See *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). Not only

was Rebecca's discharge extraordinarily close in time with her FMLA request, but there were also no other reasons for her to be disciplined. It is the Defendant's policy that any discipline for absences "fall off" a year after their occurrence. (Exhibit B, pg. 104). In February 2007, Rebecca's only attendance issues were for unforeseeable health problems related to her pregnancy. (Exhibit O). When she was absent on November 9 and November 30, 2006, Rebecca used sick time. (Exhibit B, pg. 91). Apparently it is the policy of the Defendant to discipline its employees for being sick. Also, Ms. Matchett did not mention any prior problems with tardiness or absenteeism when she produced the no-time-off-for-the-next-thirty-days document. (Exhibit B, pg. 94). The only reason left for her discharge is her request for FMLA leave.

### 2. Can the Plaintiff establish an "interference" claim under the Act?

The second way to establish an FMLA claim is to show that the rights of the employee under the Act were interfered with or denied. "In order to establish an FMLA interference claim, a plaintiff must demonstrate that: (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled." *Killian*, at 556, citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir.2005).

The first three prongs of this analysis have already been established in Sections A through C of this brief. The major issues in our case are the fourth and fifth prongs of the above analysis: whether the Plaintiff, Rebecca Finley, gave the Defendant, Manor Care, sufficient notice of her intention to take leave, and whether the Defendant denied her benefits under the

Act.

> ### a. Did the Plaintiff provide the Defendant with notice of her intention to take leave?

Please refer to the discussion in section D.1.b.(2)., for an analysis of the adequacy of the Plaintiff's notice. That analysis applies equally well in an "interference" situation.

> ### b. Did the Defendant deny the Plaintiff FMLA benefits to which she was entitled?

The fifth prong looks at whether the employer denied FMLA benefits that the employee was entitled to. "Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer." *Arban*, at 401. As has already been discussed, the Plaintiff was entitled to up to 12 weeks of FMLA leave under the statute so that she could see to her son's serious health condition, but was denied the exercise of those rights, even though all statutory requirements had been met.

"By the same token, the FMLA is not a strict-liability statute." *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006). "Employees seeking relief under the entitlement theory must therefore establish that the employer's violation caused them harm." *Ibid.*, at 508. "Both the statute and the [Department of Labor] regulation likewise establish that interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Ibid*. "An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Arban*, at 401. Determining whether an employer interfered with or denied an employee an FMLA benefit to which they were entitled is

an objective inquiry "divorced from the employer's motives, with the central question being simply whether the employee was entitled to the FMLA benefits at issue." *Edgar*, at 511.

The Plaintiff was discharged from the Defendant's employ for requesting FMLA leave, which is a violation of the Act. Though the Defendant will almost certainly claim that they had a legitimate reason for discharging the Plaintiff, it is clear that she would not have been discharged had she not requested FMLA leave. When she requested leave, the Plaintiff was immediately faced with a conundrum. Either sign a document affirming that she would not take any time off for the next 30 days (which must include FMLA leave) and lose the ability to care for her son, or be terminated. If she had not requested FMLA leave, she would not have been asked to sign such a document, or, even if she had been, she would have had no problem with signing it. Therefore, if she had not requested FMLA leave, she would not have been discharged.

## **CONCLUSION**

The plain truth of this case is that Rebecca Finley was denied those rights that were vouchsafed for by the Family and Medical Leave Act of 1993. She and others like her that have had emergency situations arise where a son or daughter requires care because of a serious health condition, must be granted leave if they meet the statutory requirements. Rebecca met those requirements, but instead of being granted leave, she was denied it and discharged. Further, no genuine issue of material fact exists with regard to any of the legal questions raised in this brief, and therefore the Plaintiff should be granted summary disposition, pursuant to Federal Rule of Civil Procedure 56.

Dated: 08/26/08 /s/_____
Robert A. Pirkola (P70785)
MOUW & CELELLO, P.C.
Attorney for Plaintiff
P.O. Box 747
Iron Mountain, MI 49801
(906)774-2480
rap@mouwcelello.com